[Cite as *State ex rel. Holmes v. Indus. Comm.*, 2014-Ohio-4823.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State of Ohio, ex rel. Ramona E. Holmes, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No. 14AP-73 |
| | : | |
| Industrial Commission of Ohio and Wexner Medical Center East, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on October 30, 2014

*The Bainbridge Firm, LLC, Andrew J. Bainbridge, Christopher J. Yeager, Carol L. Herdman* and *Zachary L. Tidaback,* for relator.

*Michael DeWine*, Attorney General, and *Colleen C. Erdman*, for respondent Industrial Commission of Ohio.

*Isaac Wiles Burkholder & Carol Teetor, LLC,* and *J. Miles Gibson,* for respondent Wexner Medical Center East.

IN MANDAMUS

CONNOR, J.

{¶ 1} Relator, Ramona E. Holmes, has filed this original action seeking a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order which denied relator's application for working wage loss ("WWL") compensation, and to order the commission to find that she is entitled to that compensation.

{¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued a decision,

which includes findings of fact and conclusions of law and is appended to this decision. The magistrate recommended that we deny the requested writ of mandamus, as the medical evidence relator submitted in support of her application for WWL was inconsistent and equivocal, and because relator failed to support her application for WWL with evidence of a good-faith search for suitable, comparably paying employment, as required by Ohio Adm.Code 4125-1-01(C) and (D).

{¶ 3} No objections to the magistrate's decision have been filed.

{¶ 4} Finding no error of law or other defect on the face of the magistrate's decision, and following our own independent review, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's recommendation, we deny the requested writ of mandamus.

*Writ of mandamus denied.*

BROWN and LUPER SCHUSTER, JJ., concur.

————————————————

**A P P E N D I X**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State of Ohio ex rel. Ramona E. Holmes, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No.  14AP-73 |
| | : | |
| Industrial Commission of Ohio and Wexner Medical Center East, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on June 25, 2014

---

*The Bainbridge Firm, LLC, Andrew J. Bainbridge, Christopher J. Yeager, Carol L. Herdman* and *Zachary L. Tidaback*, **for relator.**

*Michael DeWine*, **Attorney General, and** *Colleen C. Erdman*, **for respondent Industrial Commission of Ohio.**

*Isaac Wiles Burkholder & Carol Teetor, LLC,* **and** *J. Miles Gibson,* **for respondent Wexner Medical Center East.**

---

IN MANDAMUS

{¶ 5}  Relator, Ramona E. Holmes, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which denied relator's application for working wage

loss ("WWL") compensation, and ordering the commission to find that she is entitled to that compensation.

<u>Findings of Fact</u>:

{¶ 6}   1. Relator sustained a work-related injury on November 10, 2010, and her workers' compensation claim was allowed for the following conditions:

> Tendonitis right rotator cuff; right impingement syndrome; right rotator cuff tear.

{¶ 7}   2. Relator treated with R. Earl Bartley, M.D., on January 10, 2011. In his letter of that same date addressed to relator's general physician, Dr. Bartley discussed relator's symptoms:

> The right shoulder has a normal appearance. The shoulder is tender to palpation along the anterolateral deltoid. Active shoulder motion is noted at forward flexion of 130 degrees with abduction of 105 degrees, both with pain. Patient has a positive impingement test. Patient has a positive supraspinatus test. Patient has a positive mild crossover test. Weakness is noted in the shoulder 5-/5 in all planes. Reflexes in the arms are normal. Neurosensory examination of the upper extremities is normal. I reviewed x-rays of the right shoulder that are normal. Diagnosis is rotator cuff tendinopathy. Rule out rotator cuff tear.

{¶ 8}   Thereafter, Dr. Bartley set forth the following plan:

> An MRI scan of the right shoulder. We will get authorization for a cortisone shot in the off chance that there is no full thickness or partial thickness tear of the rotator cuff. I will also add some Voltaren gel to apply to the shoulder and to see if we can calm some of this down in the interim.

{¶ 9}   3. An MRI taken February 8, 2011 revealed the following:

> [One] Mild to moderate subacromial arch stenosis. Moderate hypertrophic supraspinatus and infraspinatus tendinosis. Without rotator cuff tendon tear. Subacromial/subdeltoid bursitis.
> [Two] Glenohumeral arthrosis and moderate effusion.
> [Three] Mild to moderate subscapularis tendinosis.

{¶ 10} 4. Relator followed up with Dr. Bartley and, in an office note dated February 14, 2011, Dr. Bartley noted that he gave relator a cortisone shot, that he would

ask for a period of physical therapy to strengthen her shoulder, and that he would submit the additional diagnosis of impingement syndrome.

{¶ 11} 5. In an office note dated April 11, 2011, Dr. Bartley noted that surgery was planned:

> Right shoulder arthroscopy, subacromial decompression and Mumford with platelet gel. We'll schedule this as an outpatient following authorization. Maintain current restrictions.

{¶ 12} 6. Relator underwent surgery on May 5, 2011. The postoperative diagnosis was:

> Right shoulder partial-thickness tear rotator and cuff labral tear with impingement syndrome acromioclavicular joint degenerative joint disease.

{¶ 13} 7. There are no treatment notes in the record following the May 5, 2011 surgery until after a second surgery.

{¶ 14} 8. The next record is an operative report dated November 10, 2011. Apparently, relator underwent a second surgery, and Dr. Bartley noted as follows in the operative report:

> Revision acromioplasty performed. Rotator cuff viewed superiorly. There was significant fraying noted at the supraspinatus and a thinning at the supraspinatus region. The partial-thickness tear was completed. * * * There was also noted to be some superior fraying to the supraspinatus.

{¶ 15} 9. In an office note dated February 6, 2012, Dr. Bartley noted:

> She's ready to go back to work. We'll work strengthening with the Thera-Band to get her function up. I discussed this with her. I'll write a 25 pound lifting restriction and get her back to work tomorrow.

{¶ 16} 10. Dr. Bartley completed a C-84 form dated February 6, 2012 noting that relator was not able to return to her former position of employment and further that she was unable to return to any other modified employment from May 5, 2011 through an estimated return-to-work date of April 6, 2012.

{¶ 17} 11. A letter dated February 15, 2012, was generated by CareWorks Consultants Inc. ("CareWorks") and was directed to Dr. Bartley. According to the letter, relator had participated in a physical therapy program and was discharged when it was determined that she was able to return to work. It was further noted that the Ohio Bureau of Workers' Compensation ("BWC") had received Dr. Bartley's February 6, 2012 C-84 indicating that relator was not able to return to work in any modified position. Dr. Bartley was asked whether or not, in his medical opinion, relator had reached maximum medical improvement ("MMI") and Dr. Bartley responded that she had not.

{¶ 18} 12. Dr. Bartley completed a Medco-14 form dated March 22, 2012. Dr. Bartley indicated that relator was able to return to work with restrictions from February 7 through March 20, 2012 and that she was released to return to work with no restrictions as of March 21, 2012.

{¶ 19} 13. In an office noted dated April 9, 2012, Dr. Bartley indicated that he recommended a cortisone shot followed by physical therapy three times a week for three weeks. He also noted that he would request vocational rehabilitation for work hardening/work conditioning, a functional capacity evaluation, and job search/job skills.

{¶ 20} 14. Dr. Bartley completed another C-84 form dated April 9, 2012 certifying that relator was not able to return to her former position of employment and was not able to perform any other modified work from April 6 through an estimated return-to-work date of July 9, 2012.

{¶ 21} 15. A functional capacity evaluation was completed by NovaCare Rehabilitation ("NovaCare"). In the July 9, 2012 report, the evaluators concluded that relator was capable of performing light-duty work as follows:

> SUMMARY
>
> R[a]mona Holmes demonstrated the ability to function in the Light physical demand level according to U.S. Department of Labor on an 8 hour per day basis.
>
> R[a]mona Holmes demonstrated the ability to occasionally lift up to 17 lbs. floor to waist, 15 lbs. waist to shoulder, 12 lbs. floor to shoulder and carry up to 12 lbs. occasionally. R[a]mona Holmes completed a single stage treadmill test at 2.6 mph and 5% grade. This was sufficient to predict

R[a]mona Holmes's functional aerobic capacity at 3.26 METS for an 8 hour time period.

Deficits identified during testing include: decreased right UE ROM and strength; decreased right LE strength.

R[a]mona Holmes demonstrated consistent performance throughout testing. This, in combination with physiological responses (heart rate and respiratory rate), movement and muscle recruitment patterns both aware and unaware of observation, indicates that the results of this evaluation can be considered to be an accurate representation of R[a]mona Holmes's functional abilities.

PHYSICAL DEMAND LEVEL
LIGHT

{¶ 22} 16. In an office note dated July 18, 2012, Dr. Bartley noted his physical findings on examination, indicated that he received a "verbal" to submit the request for job search following C-9 authorization and that he would see relator back in six weeks.

{¶ 23} 17. A C-9 requesting job search was signed by Dr. Bartley on July 23, 2012 and was allowed by CareWorks on July 26, 2012.

{¶ 24} 18. On a vocational training tool dated July 26 and 31, 2012, it appears that relator was found ineligible for vocational rehabilitation services because her physician of record had confirmed that she was currently working full duty.

{¶ 25} 19. In a letter dated August 3, 2012, relator appealed the decision to deny her vocational rehabilitation explaining that, for financial reasons, she had been working two jobs when she was injured and that, while she was currently able to perform one of those jobs, she was not able to perform the other and did need vocational rehabilitation services.

{¶ 26} 20. In a letter dated August 27, 2012, relator asked respondent Wexner Medical Center East ("Wexner Medical Center") if she could return to her former position of employment at Talbot Hall as a patient care coordinator within the physical limitations prescribed by the functional capacity evaluation ("FCE") dated July 9, 2012.

{¶ 27} 21. In a medical report dated September 14, 2012, Dr. Bartley noted that relator had the following restrictions from February 7, 2012 through July 18, 2013:  could

sit for up to three hours in an eight-hour work day but could not stand nor could she walk; occasionally lift and carry between 11 and 17 pounds; precluded from using her right arm for pushing and pulling arm controls; and further limited with regards to bending, squatting, crawling, and reaching.

{¶ 28} 23. On October 23, 2012, relator filed a C-86 motion asking for WWL compensation from February 7, 2012 through the present and continuing. Relator indicated that she attached a power of attorney, the C-140 completed by Dr. Bartley, her letter to her employer of record asking that she be returned to work, the FCE, her registration with OhioMeansJobs, as well as paystubs.

{¶ 29} 24. Relator's motion was heard before a district hearing officer ("DHO") on December 7, 2012. The DHO denied relator's motion, finding that it was not supported by sufficiently persuasive evidence. The DHO stated:

> It is the order of the District Hearing Officer that payment of working wage loss compensation is denied from 02/27/2012 through 12/07/2012. The District Hearing Officer finds that wage loss compensation over that period is not supported by sufficiently persuasive evidence of injury-related physical restrictions. Specifically, Dr. Bartley's C-140 Medical Report dated 09/14/2012 is found to be unpersuasive in restricting the Injured Worker to sitting three hours, standing 0 hours, and walking 0 hours per eight hour work day in addition to restrictions on lifting and carrying, for the period 02/07/2012 through 07/18/2013. This claim is allowed only for right shoulder conditions. Dr. Bar[t]ley has not explained why those conditions would cause any restriction on sitting, standing, and walking, let alone the severe time limits he imposed. Moreover, the report dated 09/14/2012 is inconsistent with Dr. Bar[t]ley's earlier MEDCO-14 report dated 03/22/2012, in which he stated that the Injured Worker could return to work with no restrictions on 03/21/2012. That retroactive change of opinion has not been explained.

{¶ 30} 25. Dr. Bartley completed another C-140 medical report dated January 4, 2013, wherein he indicated that relator could sit, stand, and walk, each for up to eight hours a day, occasionally lift and carry between 11 and 20 pounds, was restricted from pushing and pulling arm controls with her right leg, could continuously squat, crawl, and climb, but had limitations in bending and reaching.

{¶ 31} 26. In an office note dated January 9, 2013, Dr. Bartley noted:

> To maintain current work restrictions. There had to be adjustments made due to an error in completion of the work restriction form. This has been amended. Follow up in the office in six months for a routine check.

{¶ 32} 27. Relator's appeal was heard before a staff hearing officer ("SHO") on January 25, 2013. The SHO vacated the prior DHO order and relied on the FCE and the January 4, 2013 corrected C-140 of Dr. Bartley to find that relator was medically entitled to WWL. Thereafter, the SHO noted that Ohio Adm.Code section 4125-1-01(D)(1)(c) requires additional job search efforts from those seeking WWL, but not working in an amount of time equal to their former position of employment. The SHO specifically found that relator did not perform any additional documented job search while performing her second employment position during this period equal to the combination of hours that exceeded full-time hours in the former positions of employment. As such, while the SHO did award WWL, the SHO reduced it as follows because relator had not performed a job search:

> The Staff Hearing Officer finds that the Injured Worker did not perform any additional documented job search while performing her second employment position over this period equal to the combination of hours that exceeded full-time hours in the former positions of employment. The Staff Hearing Officer therefore finds the provision of Ohio Adm.Code 4125-1-01(F)(3)(b) applicable and awards wage loss compensation pursuant to that provision, to wit: The Injured Worker is to be paid wage loss compensation as the average weekly wage less actual wages earned times 2/3, reduced by a commensurate amount proportional to the number of hours actually worked, i.e. 36 hours worked per week is reduced by an additional 10%; 34 hours worked per week is reduced by an additional 15%; and 32 hours worked per week is reduced by an additional 20%, etc. This award is not to exceed the weekly statutory maximum allowable for a 2010 claim and may not exceed 200 weeks.
>
> Finally, the Staff Hearing Officer finds that the Injured Worker did register with Ohio Department of Jobs and Family Services and did seek suitable employment with the instant Employer, per documents on file, satisfying those requirements. Therefore, the Staff Hearing Officer grants the

request for wage loss compensation but only to the extent expressed in this order.

{¶ 33} 28. Wexner Medical Center filed a request for reconsideration arguing that the SHO order contained a clear mistake of fact and law because the SHO awarded relator WWL compensation despite the fact that she did not conduct a good-faith job search.

{¶ 34} 29. In an interlocutory order mailed April 10, 2013, the commission determined that the employer presented sufficient evidence to warrant adjudication of the request for reconsideration because the SHO granted WWL despite the fact that relator had failed to conduct a job search.

{¶ 35} 30. Before the hearing on the request for reconsideration, Dr. Bartley authored a report dated May 10, 2013, wherein he stated:

> I have reviewed my notes regarding Ramona Holmes. As you are aware, she has sustained a right shoulder injury on November 10, 2011, and was seen in the office for this injury on January 10, 2011. An MRI scan was obtained of the right shoulder on February 7, 2011, that revealed subacromial arch stenosis with moderate hypertrophic supraspinatus and infraspinatus tendinosis without rotator cuff tear and glenohumeral arthrosis with mild-to-moderate subscapularis tendinosis. She underwent right shoulder arthroscopy on May 11, 2011, and subsequently underwent repeat surgery to the right shoulder on November 10, 2011, for right rotator cuff repair after the initial surgery arthroscopically was unsuccessful. Her duties and time were decreased following the evaluation of the MRI scan result. I felt that the right shoulder problem that was seen on MRI scan would result in difficulties that limiting her work hours would be the reasonable thing to do until we could address this surgically. This was the case. Our intention was to solve this problem surgically and then return her back to full duty, however, after the initial surgery, she did not progress and a subsequent surgery was required.

{¶ 36} 31. A hearing was held before the commission on May 21, 2013. The SHO found that the employer had met its burden of proof finding:

> After further review and discussion, it is the finding of the Industrial Commission that the Employer has met its burden of proving that the Staff Hearing Officer order, issued 01/31/2013, contains clear mistakes of fact and law.

Specifically, the Staff Hearing Officer committed clear mistakes of fact and law when he found the C-140 of R. Earl Bartley, M.D., dated 01/04/2013, and the Functional Capacity Evaluation (FCE), dated 07/09/2012, were persuasive evidence and relied upon these reports to award working wage loss compensation commencing 02/07/2012. The Commission finds Dr. Bartley's C-84 Requests for Temporary Total Disability Compensation dated 02/06/2012 and 04/09/2012, Dr. Bartley's office notes dated 02/06/2012, 04/09/2012, 07/18/2012, and 01/09/2013, Dr. Bartley's 03/22/2012 Medco-14 Physician's Reports of Work Ability, and Dr. Bartley's C-140 Medical Reports, dated 09/14/2012 and 01/04/2013, provide contradictory and inconsistent opinions regarding the Injured Worker's capacity to return to light-duty and the Injured Worker's capacity to perform full-duty work without restrictions. Furthermore, Dr. Bartley's 09/14/2012 C-140 report appeared to have considered conditions not allowed in the claim. Dr. Bartley's 09/14/2012 C-140 report also differs from his 01/04/2013 C-140 report. Dr. Bartley's opinions are found to be equivocal and inconsistent. Therefore, Dr. Bartley's reports are not found to be persuasive medical evidence supporting payment of working wage loss compensation, commencing 02/07/2012, per State ex rel. Eberhardt v. Flexible [sic] Corp., 70 Ohio St.3d 649, 640 N.E.2d 815 (1994).

In addition the Commission finds the Staff Hearing Officer made a clear mistake of law when he awarded working wage loss compensation from 02/07/2012, despite the lack of any documented job search effort to seek suitable work of comparable pay as required by Ohio Adm.Code 4125-1-01.

{¶ 37} As a result, the commission vacated the January 31, 2013 order. At the outset, the commission discussed the work relator was engaged in at the time she was injured:

By way of history, the Injured Worker was injured on 11/10/2010 while working as a patient care coordinator for Wexner Medical Center East (the Employer of Record). The Injured Worker's duties as a patient care coordinator were similar to that of a nurse, a fast-paced job that sometimes required heavy lifting. At the time of the industrial injury, the Injured Worker was working part-time as a patient care coordinator for the Employer (approximately 24 hours per

week), and was working full-time as a staff nurse (40 hours per week) with Comp Drug Corp. per the Injured Worker's testimony at hearing. The Injured Worker's position at Comp Drug Corp. was a sedentary position. The Injured Worker received temporary total disability compensation from 05/05/2011 through 02/06/2012. On 02/07/2012, the Injured Worker returned to work as a staff nurse at Comp Drug Corp. (the sedentary position), but only worked part-time rather than full-time. There was no explanation provided at hearing why the Injured Worker did not return to work full-time with Comp Drug Corp. The Injured Worker did not return to her part-time position as a patient care coordinator with the Employer. Per the 03/06/2012 and 09/05/2012 Bureau of Workers' Compensation (BWC) Claims Service Specialist notes, Employer terminated the Injured Worker due to the length of her leave of absence. The Injured Worker's average weekly wage was set at $2,401.76 per a 02/20/2013 BWC order. The Injured Worker's average weekly wage was based upon earnings from both employers.

{¶ 38} Thereafter, the commission denied relator's request for WWL for two reasons. First, the commission found that the medical evidence on file was not persuasive because Dr. Bartley's evidence was inconsistent and equivocal. The commission first pointed out the discrepancy between Dr. Bartley's February 6, 2012 C-84 report indicating that relator was unable to return to her former position of employment and was not able to return to other employment from May 5, 2011 to April 6, 2012 and compared it to his February 6, 2012 office note wherein he indicated that relator was doing better and was ready to go back to work lifting up to 25 pounds.

{¶ 39} The commission next noted the February 21, 2012 questionnaire from CareWorks wherein Dr. Bartley indicated that relator had not reached MMI and that she had returned to work with restrictions on February 7, 2012. The commission compared that to the March 22, 2012 Medco-14 indicating that relator had temporary restrictions from February 7 through March 20, 2012 and was released to return to work with no restrictions on March 21, 2012. The commission identified several more inconsistencies and identified those in its order. (Stipulation of evidence, 74-78.)

{¶ 40} The commission also noted that there was a gap in treatment from July 19, 2012 through January 9, 2013. Based on the numerous inconsistencies in Dr. Bartley's

office notes, C-84, Medco-14, and C-140 reports regarding relator's physical limitations, the commission found that Dr. Bartley's opinion was not persuasive.

{¶ 41} The commission also denied relator's request for WWL compensation because there was no documented job search from February 7, 2012 through mid-May May 2013. The commission cited Ohio Adm.Code 4125-1-01, noted that relator did not contact her employer of record until August 27, 2012, and had not provided documentation that she registered with the Ohio Department of Job and Family Services ("ODJFS"), and that her submission of on-line job search efforts beginning mid-May May 2013 were insufficient evidence of a good-faith job search. As such, the commission denied relator's request for WWL compensation.

{¶ 42} 32. Thereafter, relator, Ramona E. Holmes, filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 43} Relator argues that the commission abused its discretion when it erroneously found that relator had failed to register with ODJFS as required by Ohio Adm.Code 4125-1-01 and when it failed to rely on Dr. Bartley's explanation contained in his May 10, 2013 letter.

{¶ 44} The magistrate finds that the commission did abuse its discretion when it found that relator had failed to register with ODJFS and specifically notes that the commission acknowledges that error, but that the commission did not abuse its discretion when it found that the medical evidence that relator submitted in support of her motion for WWL compensation was inconsistent and equivocal, and the commission was not bound to accept Dr. Bartley's explanation contained in his May 10, 2013 letter.

{¶ 45} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 46} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel.*

*Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order, which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 47} The commission found that the medical evidence submitted from Dr. Bartley was inconsistent and equivocal.

{¶ 48} In *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649, 657 (1994), the Supreme Court of Ohio summarized the distinction between the ambiguous, equivocal and repudiated reports as follows:

> [E]quivocal medical opinions are not evidence. See, also, *State ex rel. Woodard v. Frigidaire Div., Gen. Motors Corp.* (1985), 18 Ohio St.3d 110 * * *. Such opinions are of no probative value. Further, equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Ambiguous statements, however, are considered equivocal only while they are unclarified. [*State ex rel. Paragon v. Indus. Comm.*, 5 Ohio St.3d 72 (1983).] Thus, once clarified, such statements fall outside the boundaries of [*State ex rel. Jennings v. Indus. Comm.*, 1 Ohio St.3d 101 (1982)], and its progeny.
>
> Moreover, ambiguous statements are inherently different from those that are repudiated, contradictory or uncertain. Repudiated, contradictory or uncertain statements reveal that the doctor is not sure what he means and, therefore, they are inherently unreliable. Such statements relate to the doctor's position on a critical issue. Ambiguous statements, however, merely reveal that the doctor did not effectively convey what he meant and, therefore, they are not inherently unreliable. Such statements do not relate to the doctor's position, but to his communication skills. If we were to hold that clarified statements, because previously ambiguous, are subject to *Jennings* or to commission rejection, we would

> effectively allow the commission to put words into a doctor's mouth or, worse, discount a truly probative opinion. Under such a view, any doctor's opinion could be disregarded merely because he failed on a single occasion to employ precise terminology. In a word, once an ambiguity, always an ambiguity. This court cannot countenance such an exclusion of probative evidence.

{¶ 49} In its order, the commission noted numerous inconsistencies in the medical records of Dr. Bartley including: (1) The February 6, 2012 C-84 report indicated that relator was unable to return to her former position of employment and was not able to return to any other employment from May 5, 2011 to April 6, 2012, while the February 6, 2012 office note indicated that relator was doing better and was ready to go back to work, and that relator could lift up to 25 pounds and could return to work February 7, 2012; (2) On February 21, 2012, Dr. Bartley indicated that relator had not reached MMI and that she had returned to work with restrictions on February 7, 2012; however, on March 22, 2012, Dr. Bartley completed a Medco-14 indicating that relator had temporary restrictions from February 7 through March 20, 2012 and was released to return to work with no restrictions on March 21, 2012; (3) On April 9, 2012, Dr. Bartley completed a C-84 certifying temporary total disability ("TTD") compensation from April 6 through July 9, 2012 indicating that relator could not return to her former position of employment nor could she perform any other employment; however, his April 9, 2012 office note indicated that relator had been doing better, that her employer would not permit her to return to work because she had been off too long. Dr. Bartley recommended a job search, an FCE, vocational rehabilitation, and a work-hardening/work conditioning program; (4) C-84 forms completed by relator during that time period indicated that she was working; (5) Dr. Bartley's July 18, 2012 office note indicated that relator's right shoulder was stable and that he was requesting that she be accepted for job search; (6) Dr. Bartley's September 14, 2012 C-140 medical report noted limitations based on a July 18, 2012 medical examination; however, Dr. Bartley failed to indicate if the restrictions were temporary or permanent, and that they were for a retroactive five-month period of time beginning February 7, 2012 through July 18, 2013. Dr. Bartley included specific limitations, which included that relator was not able to stand or walk at all. (The commission specifically found that limitations on relator's ability to stand, walk, squat,

and bend were not related to the allowed right shoulder conditions.); (7) The July 9, 2012 FCE indicated that relator was capable of performing light physical work; (8) There was a gap in treatment and no medical records existed from July 19, 2012 through January 9, 2013; (9) Dr. Bartley's January 9, 2013 examination indicated that relator's work restrictions were being maintained and that adjustments had been made in the completion of work restrictions due to errors. (As the commission noted, Dr. Bartley did not provide any explanation as to what the adjustment or errors were.); and (10) Dr. Bartley's C-140 medical report dated January 4, 2013 was based on his December 28, 2012 examination and continued some of the earlier restrictions in terms of lifting, but indicated that relator had no limitations regarding sitting, standing, and walking.

{¶ 50} Upon review of the aforementioned records, the magistrate finds that the commission did not abuse its discretion by finding that the medical reports of Dr. Bartley were inconsistent and equivocal. He opined that she was unable to perform any work whatsoever at a time when it is clear that she was working. While it is true that she was performing a job that she had been performing at the same time that she was injured while also working for the employer of record here, it is clear that, despite his opinion that she could not work at all, she was working. Further, Dr. Bartley indicated that relator had no restrictions and then noted that she had restrictions while his office notes indicated that she was doing better. After opining that she could perform no work whatsoever, Dr. Bartley recommended a job search, an FCE, vocational rehabilitation, and a work-hardening/work-conditioning program. All of these are inconsistent.

{¶ 51} Relator contends that the commission abused its discretion by not accepting Dr. Bartley's explanation. A doctor may clear up any inconsistency or ambiguity in his reports. Dr. Bartley's May 10, 2013 report provides:

> I have reviewed my notes regarding Ramona Holmes. As you are aware, she has sustained a right shoulder injury on November 10, 2011, and was seen in the office for this injury on January 10, 2011. An MRI scan was obtained of the right shoulder on February 7, 2011, that revealed subacromial arch stenosis with moderate hypertrophic supraspinatus and infraspinatus tendinosis without rotator cuff tear and glenohumeral arthrosis with mild-to-moderate subscapularis tendinosis. She underwent right shoulder arthroscopy on May 11, 2011, and subsequently underwent repeat surgery to

the right shoulder on November 10, 2011, for right rotator cuff repair after the initial surgery arthroscopically was unsuccessful. Her duties and time were decreased following the evaluation of the MRI scan result. I felt that the right shoulder problem that was seen on MRI scan would result in difficulties that limiting her work hours would be the reasonable thing to do until we could address this surgically. This was the case. Our intention was to solve this problem surgically and then return her back to full duty, however, after the initial surgery, she did not progress and a subsequent surgery was required.

{¶ 52} Contrary to relator's argument, this letter does not explain why Dr. Bartley issued contrary and equivocal opinions during the relevant time period. The magistrate finds that the commission did not abuse its discretion by not accepting this as an explanation and in continuing to find that the medical evidence was insufficient.

{¶ 53} With regard to relator's job search, the commission has already acknowledged that it abused its discretion when it indicated that there was no evidence that relator had registered with ODJFS. However, the magistrate finds the commission did not abuse its discretion in denying relator's application for WWL compensation after finding that she had not conducted a good-faith job search for suitable employment which is comparably paying work.

{¶ 54} Entitlement to wage loss compensation is governed by R.C. 4123.56(B), which provides:

Where an employee in a claim allowed under this chapter suffers a wage loss as a result of returning to employment other than the employee's former position of employment or as a result of being unable to find employment consistent with the claimant's physical capabilities, the employee shall receive compensation at sixty-six and two-thirds per cent of the employee's weekly wage loss not to exceed the statewide average weekly wage for a period not to exceed two hundred weeks.

{¶ 55} In order to receive workers' compensation, a claimant must show not only that a work-related injury arose out of and in the course of employment, but, also, that a direct and proximate causal relationship exists between the injury and the harm or disability. *State ex rel. Waddle v. Indus. Comm.*, 67 Ohio St.3d 452 (1993). This principle

is equally applicable to claims for wage loss compensation. *State ex rel. The Andersons v. Indus. Comm.*, 64 Ohio St.3d 539 (1992). As noted by the court in *State ex rel. Watts v. Schottenstein Stores Corp.*, 68 Ohio St.3d 118 (1993), a wage loss claim has two components: a reduction in wages and a causal relationship between the allowed condition and the wage loss.

{¶ 56} In considering a claimant's eligibility for wage loss compensation, the commission is required to give consideration to, and to base the determination on, evidence relating to certain factors, including claimant's search for suitable employment. The Supreme Court of Ohio has held that a claimant is required to demonstrate a good-faith effort to search for suitable employment which is comparably paying work before claimant is entitled to both nonworking wage loss and working wage loss compensation. *State ex rel. Pepsi-Cola Bottling Co. v. Morse*, 72 Ohio St.3d 210 (1995); *State ex rel. Reamer v. Indus. Comm.*, 77 Ohio St.3d 450 (1997); and *State ex rel. Rizer v. Indus. Comm.*, 88 Ohio St.3d 1 (2000). A good-faith effort necessitates claimant's consistent, sincere, and best attempt to obtain suitable employment that will eliminate the wage loss.

{¶ 57} Ohio Adm.Code 4125-1-01(A) defines "suitable employment" and "comparably paying work" as follows:

> (7) "Suitable employment" means work which is within the claimant's physical capabilities, and which may be performed by the claimant subject to all physical, psychiatric, mental, and vocational limitations to which the claimant is subject at the time of the injury which resulted in the allowed conditions in the claim or, in occupational disease claims, on the date of the disability which resulted from the allowed conditions in the claim.

> (8) "Comparably paying work" means suitable employment in which the claimant's weekly rate of pay is equal to or greater than the average weekly wage received by the claimant in his or her former position of employment.

{¶ 58} Ohio Adm.Code 4125-1-01(C) identifies for claimants the relevant information which must be contained in an application for wage loss compensation. Specifically, Ohio Adm.Code 4125-1-01(C)(5) provides:

> (5) All claimants seeking or receiving working or non-working wage loss payments shall supplement their wage

loss application with wage loss statements, describing the search for suitable employment, as provided herein. The claimant's failure to submit wage loss statements in accordance with this rule shall not result in the dismissal of the wage loss application, but shall result in the suspension of wage loss payments until the wage loss statements are submitted in accordance with this rule.

(a) A claimant seeking or receiving wage loss compensation shall complete a wage loss statement(s) for every week during which wage loss compensation is sought.

(b) A claimant seeking wage loss compensation shall submit the completed wage loss statements with the wage loss application and/or any subsequent request for wage loss compensation in the same claim.

(c) A claimant who receives wage loss compensation for periods after the filing of the wage loss application and/or any subsequent request for wage loss compensation in the same claim shall submit the wage loss statements completed pursuant to paragraphs (C)(5)(a), (C)(5)(d) and (C)(5)(e) of this rule every four weeks to the bureau of worker's compensation or the self-insured employer during the period when wage loss compensation is received.

(d) Wage loss statements shall include the address of each employer contacted, the employer's telephone number, the position sought, a reasonable identification by name or position of the person contacted, the method of contact, and the result of the contact.

(e) Wage loss statements shall be submitted on forms provided by the bureau of workers' compensation.

Thereafter, Ohio Adm.Code 4125-1-01(D) provides, in pertinent part:

(D) The claimant is solely responsible for and bears the burden of producing evidence regarding his or her entitlement to wage loss compensation. Unless the claimant meets this burden, wage loss compensation shall be denied.

* * *

In considering a claimant's eligibility for compensation for wage loss, the adjudicator shall give consideration to, and

base the determinations on, evidence in the file, or presented at hearing, relating to:

(1) The claimant's search for suitable employment.

(a) As a prerequisite to receiving wage loss compensation for any period during which such compensation is requested, the claimant shall demonstrate that he or she has:

(i) Complied with paragraph (C)(2) of this rule and, if applicable, with paragraph (C)(3) of this rule [relating to the submission of medical evidence];

(ii) Sought suitable employment with the employer of record at the onset of the first period for which wage loss compensation is requested. The claimant shall also seek suitable employment with the employer of record where there has been an interruption in wage loss compensation benefits for a period of three months or more; and

(iii) Registered with the Ohio bureau of employment services and begun or continued a job search if no suitable employment is available with the employer of record.

(b) A claimant may first search for suitable employment which is within his or her skills, prior employment history, and educational background. If within sixty days from the commencement of the claimant's job search, he or she is unable to find such employment, the claimant shall expand his or her job search to include entry level and/or unskilled employment opportunities.

(c) A good faith effort to search for suitable employment which is comparably paying work is required of those seeking non-working wage loss and of those seeking working-wage loss who have not returned to suitable employment which is comparably paying work, except for those claimants who are receiving public relief and are defined as work relief employees in Chapter 4127. of the Revised Code. A good faith effort necessitates the claimant's consistent, sincere, and best attempts to obtain suitable employment that will eliminate the wage loss.

{¶ 59} Ohio Adm.Code 4125-1-01(D)(1)(c) provides certain relevant factors to be considered by the commission in evaluating whether claimant has made a good-faith

effort. Those factors including: claimant's skills, prior employment history, and educational background; the number, quality, and regularity of contacts made with prospective employers; for a claimant seeking any amount of working wage loss compensation, the amount of time devoted to making prospective employer contacts during the period for which working wage loss is sought, as well as the number of hours spent working, any refusal by claimant to accept assistance from the BWC in finding employment; any refusal by claimant to accept the assistance of any public or private employment agency; labor market conditions; claimant's physical capabilities; any recent activity on the part of claimant to change her place of residence and the impact such change would have on the reasonable probability of success and the search for employment; claimant's economic status; claimant's documentation of efforts to produce self-employment income; any part-time employment engaged in by claimant and whether that employment constitutes a voluntary limitation on claimant's present earnings; whether claimant restricts her search to employment that would require her to work fewer hours per week than she worked in the former position of employment; and whether, as a result of physical restrictions, claimant is enrolled in a rehabilitation program.

{¶ 60} As the commission noted, relator did not provide a documented job search for the period February 7, 2012 through mid-May May 2013. There simply was no evidence in the record from which the commission could have found otherwise. The commission specifically noted that relator provided information of an online job search beginning mid-May 2013; however, the commission found that relator's documentation was insufficient evidence of a good-faith job-search effort because relator did not identify the type of position sought, the person/employer contact, and whether the position sought was within relator's physical limitations. Relator was required to do so in order to be entitled to an award of WWL compensation, and her failure to do so constitute grounds to deny her motion.

{¶ 61} Based on the foregoing, the magistrate finds it unnecessary to remand this matter to the commission for it to correct its order to indicate that relator had registered with ODJFS because to do so would not change the ultimate decision reached by the commission. The magistrate finds that relator has not demonstrated that the commission

abused its discretion when it denied her application for working wage loss compensation, and this court should deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA BROOKS

### NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).